**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| DAWN CORBIER, as Administrator of the<br>ESTATE OF JOSHUA B. JURCICH, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:16-cv-00257 |
| ST. CLAIR COUNTY SHERIFF RICHARD<br>WATSON, MAJOR PHILLIP MCLAURIN,<br>ST. CLAIR COUNTY, OFFICER STEVEN J.<br>FRIEDRICH, OFFICER JAMES D.<br>WAGENER, SERGEANT DAVID NICHOLS,<br>OFFICER MARK J. HARRIS, OFFICER<br>DANTE S. BEATTIE, OFFICER THOMAS<br>MESEY, OFFICER ERIC L. WALTER,<br>LIEUTENANT NANCY SUTHERLIN,<br>OFFICER PATRICK FULTON, and OFFICER<br>JON KNYFF, | ) ) ) ) ) ) ) ) ) ) ) ) ) | The Hon. Staci M. Yandle<br>Magistrate Judge Stephen Williams<br><br><br><br>JURY TRIAL DEMANDED |
| Defendants. | ) | |

## THIRD AMENDED COMPLAINT

Plaintiff Dawn Corbier, as Administrator for the Estate of her son Joshua B. Jurcich, by her undersigned attorneys, for her complaint against Defendants St. Clair County Sheriff Richard Watson, Major Phillip McLaurin, St. Clair County, Officer Steven J. Frierdich, Officer James D. Wagener, Sergeant David Nichols, Officer Mark J. Harris, Officer Dante S. Beattie, Officer Thomas Mesey, Officer Eric L. Walter, Lieutenant Nancy Sutherlin, Officer Patrick Fulton, and Officer Jon Knyff, alleges as follows:

## INTRODUCTION

1.       This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Joshua B. Jurcich's rights as secured by the Fourteenth Amendment to the United States Constitution.

2.       Joshua B. Jurcich was a devoted father and loving son.  He had a love for animals, the arts, and music.  He also lived with addiction and mental illness.  Because of this, for 16 years, Mr. Jurcich spent a great deal of time cycling in and out of the St. Clair County Jail ("Jail").

3.       Mr. Jurcich's substance abuse and mental health issues were well known to the Jails' security and medical staff.  Despite this fact, Jail officials housed Mr. Jurcich in conditions that exacerbated his mental illness.  On March 11, 2014, Jail staff beat Mr. Jurcich because he refused to return to a segregation cell.  Immediately after the beating, Jail staff moved Mr. Jurcich to a maximum security cell.

4.       While housed there, Mr. Jurcich actively voiced his intent to commit suicide.  Jail staff failed to take any efforts to protect or appropriately supervise Mr. Jurcich.  Less than eight hours after the beating, Jail staff found Mr. Jurcich hanging in his cell.  Mr. Jurcich was transported to the hospital where he died two days later.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

6.       Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

**PARTIES**

7.       Joshua B. Jurcich, the decedent, was a thirty-three year old who was detained at St. Clair County Jail in Belleville, Illinois from March 6, 2014, until his suicide on March 11, 2014.  Under the Americans with Disabilities Act he is a qualified person who lived with the disability of serious mental illness.  Plaintiff Dawn Corbier is Mr. Jurcich's mother and the duly appointed administrator of his estate.

8.       Defendant Richard "Rick" Watson is the Sheriff of St. Clair County.  At all times relevant to the events at issue in this case, Defendant Watson was employed by the St. Clair County Sheriff's Department in the capacity of Sheriff.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Watson promulgated rules, regulations, polices, and procedures as Sheriff of St. Clair County for the provision of certain mental health care by medical personnel and correctional officers to detainees at the St. Clair County Jail.  He is sued here in his official capacity.

9.       Defendant Major Phillip McLaurin is the Superintendent of the St. Clair County Jail.  At all times relevant to the events at issue in this case, Defendant McLaurin was employed by the St. Clair County Sheriff's Department.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant McLaurin was responsible for implementing the policies and procedures promulgated by Defendant Watson, supervising all staff and managing all aspects of Jail operations.  He is sued in his individual capacity.

10.     Defendant St. Clair County is a county of the State of Illinois.  It oversees the St. Clair County Sheriff's Department, which, in turn, operates the St. Clair County Jail.

11.     Defendants Officer Steven J. Frierdich, Officer James D. Wagener, Sergeant David Nichols, Officer Mark J. Harris, Officer Dante S. Beattie, Officer Thomas Mesey, Officer

Eric L. Walter, Lieutenant Nancy Sutherlin, Officer Patrick Fulton, and Officer Jon Knyff were employees of the St. Clair County Jail during the relevant period.  At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with St. Clair County Jail.  These defendants are sued here in their individual capacities.

## FACTUAL ALLEGATIONS

### Mr. Jurcich's Well-Documented and Substantial Risk of Suicide was Known to the Defendants

12.  Mr. Jurcich had been housed in St. Clair County Jail sixteen times between 1998 and 2014.  On at least seven occasions prior to his most recent booking, Mr. Jurcich had informed the Jail staff that he suffered from mental health problems.  On at least one occasion, Mr. Jurcich informed staff that he was suicidal:

> (a)  Beginning September 21, 2013, Mr. Jurcich was housed in the Jail for 116 days before being transferred to Treatment Alternative for Safe Communities ("TASC").  At the time of booking, Mr. Jurcich was referred for a mental health evaluation.

> (b)  Beginning May 1, 2013, Mr. Jurcich was housed in the Jail for one day.  At the time of booking, Mr. Jurcich was referred to medical for further mental health evaluation.  The booking officer also noted on the field booking form that Mr. Jurcich was "mental."

> (c)  Beginning December 5, 2012, Mr. Jurcich was housed in the Jail for one day. At the time of booking, Mr. Jurcich answered yes to two of the mental health screening questions which mandates referral for further mental health evaluation, but there is no indication on the field booking form that he was in

4

fact referred to medical for further evaluation.  The booking officer noted on the form that Mr. Jurcich was "mental."

(d) Beginning August 23, 2005, Mr. Jurcich was housed in the Jail for 10 days. The booking officer noted on the field booking form that Mr. Jurcich was "mental."  The field booking form does not include mental health screening questions.

(e) Beginning May 3, 2005, Mr. Jurcich was housed in the Jail for 42 days.  The booking officer wrote a question mark under suicide risk and mental.  This older form does not have any mental health screening questions.

(f) Beginning September 6, 2004, Mr. Jurcich was housed in the Jail for four days.  The booking officer noted on the field booking form that Mr. Jurcich was "mental."

(g) Beginning March 8, 2004, Mr. Jurcich was housed in the Jail for 25 days.  The booking officer noted on the field booking for that Mr. Jurcich was suicidal.

13.     Mr. Jurcich's medical records similarly document that he lived with a serious mental illness that placed him at an elevated risk for suicide.  The medical records document the following:

(a) In 2008, Dr. Muddasani Reddy, a psychiatrist at the Jail, diagnosed Mr. Jurcich with Bi-Polar Mood Disorder.  That diagnosis was reconfirmed during an examination of Mr. Jurcich conducted by Dr. Reddy in October 2013—five months prior to Mr. Jurcich's suicide. All of these diagnosis were clearly documented in Mr. Jurcich's file and available to the medical staff at the Jail at all times relevant to this complaint.

(b) In 2013, Nurse Reuter completed a "head to toe" assessment of Mr. Jurcich. In that assessment, she noted that Mr. Jurcich had been diagnosed with Bi-Polar Mood Disorder. This assessment was clearly documented in Mr. Jurcich's file and available to the medical staff at the Jail at all times relevant to this complaint.

(c) On October 15, 2013, Mr. Jurcich was examined by Andrae Dobbins, a mental health counselor at the St. Clair County Jail. At that time, Mr. Jurcich presented with anxiety and depression and the counselor assessed him as having Bipolar Disorder, Substance abuse and ADHD. This diagnosis was later confirmed by Dr. Reddy.

14.    Mr. Jurcich also was addicted to Heroin. During his March 2014 incarceration, both Nurse Thurman and Nurse Reuter had knowledge that he was withdrawing from Heroin.

15.    A study published by the National Institute of Health concludes that people who are dependent on drugs and alcohol are six times more likely than those who are not substance dependent to commit suicide and, people who have Bi-Polar Disorder are 60 times more likely to commit suicide than those people who do not have this diagnosis. *See* Tatjana Dragisic et al. Drug Addiction as Risk for Suicide Attempts. (July 27, 2017 7:08pm)

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4499285/.

**There is an Elevated Suicide Risk for Detainees Placed in Segregation**

16.    The term segregation refers to the practice of housing detainees alone in a cell where they are isolated and restricted to their cells from anywhere to 22-24 hours a day. Numerous studies have demonstrated that this practice greatly increases the risk of suicide. One study cited by the National Institute of Justice found that the risk of suicide increased 400 times

when a detainee is placed in single cell segregation.  According to that same publication, people

with serious mental illness who are housed in segregation are 10 times more likely than those in

the general correctional population to commit suicide.  *See* Reena Kapoor, M.D. Robery

Trestman, M.D..Phd., *Restrictive Housing in the US. Issues Challenges and Future Directions*:

*Mental Health Effects of Restrictive Housing.* National Institute of Justice (July 27, 2017

6:44pm), https://www.ncjrs.gov/pdffiles1/nij/250321.pdf.

17.     The National Commission on Correctional Health Care (NCCHC) states that "it is

well established that persons with mental illness are particularly vulnerable to the harms of

solitary confinement."  As a result NCCHS has taken the position that people with mental illness

should be excluded from solitary confinement of "any duration" and that  "solitary confinement

as an administrative method of maintaining security should be used only as an exceptional

measure when other, less restrictive options are not available, and then for the shortest time

possible."  In developing this position, NCCHC cites to a United Nations Reports stating that

"given their diminished mental capacity and that solitary confinement often results in severe

exacerbation of a previously existing mental condition," the imposition of solitary confinement,

of any duration, on persons with mental disabilities is cruel, inhuman, or degrading treatment and

also violates the Covenant and the Convention." *See* National Commission on Correctional

Health Care *Position Statement* (July 27, 2017 6:51pm), http://www.ncchc.org/solitary-

confinement.

18.     Placement in segregation can exacerbate existing mental illness and researchers

have concluded that conditions in segregation can cause a condition deemed "isolation panic"

which is characterized by "a feeling of abandonment…dead end desperation…helplessness,

tension. It is a physical reaction a demand for release or a need to escape at all costs…they react

to solitary confinement with surges of panic or rage." Sharon Shalev *A Sourcebook on Solitary Confinement* (July 27, 2017 7:02pm) http://solitaryconfinement.org/uploads/sourcebook_02.pdf

19.     According to Wexford's training materials, almost half of all jail suicides happen during the first week an individual is placed in custody and a high risk period for suicide happens after a detainee is moved to segregated housing.

## Mr. Jurcich's March 2014 Incarceration at the St. Clair County Jail
## Placement in Medical Segregation

20.     On or about March 6, 2014, Mr. Jurcich was arrested for possession of a controlled substance and taken to the St. Clair County Jail.  At all times relevant to the events at issue in this case, Mr. Jurcich was housed at the Jail.

21.     When Mr. Jurcich arrived at the Jail, Defendant Officer Steven J. Frierdich screened Mr. Jurcich to determine if his mental health put him at risk of harm.  As a result of Mr. Jurcich's responses to several questions, Defendant Frierdich indicated that Mr. Jurcich was in need of further mental health evaluation.

22.     On or about March 9, 2014, Mr. Jurcich informed Nurse Thurman that he was "dope sick" and had been diagnosed with scabies while at St. Louis University Hospital.

23.     Nurse Thurman knew that Mr. Jurcich was withdrawing from heroin and that the symptoms of heroin withdraw can make an individual "miserable."  Yet, she failed to provide Mr. Jurcich with any medical care for his heroin withdrawal.

24.     Nurse Thurman had access to Mr. Jurcich's medical file documenting his serious mental illness and his history of psychiatric care.  She did not consult his file when meeting with him on March 9, 2014.

25.     Per Nurse Thurman's order, Mr. Jurcich was placed in medical segregation in cell block AA.

26.     Nurse Thurman knew that professional standards require that she consult a patient's medical records when providing care in order to determine if a patient has had a past medical issue that counter-indicates a current course of treatment.

27.     Nurse Thurman knew that by placing Mr. Jurcich in medical segregation, she was requiring that he be housed alone in a cell.  She knew that Mr. Jurcich would be restricted to his cell for up to 24 hours a day.  She also knew that he would be denied recreation and visitation.

28.     Nurse Thurman received training from Wexford, her employer, instructing her that among other high risk factors, patients with mental disorders, patients who have been in the jail for less than a week, patients with drug addiction, and patients who have been moved to segregated housing are at a high risk for suicide.  She knew that Mr. Jurcich fit each of these risk profiles, yet she ignored this evaluated risk and ordered Mr. Jurcich's placement in segregated housing without securing him mental health care.

29.     Nurse Thurman did not provide any care to Mr. Jurcich after she placed him in segregated housing.  Nor did she observe him to determine if he was decompensating while in segregation.

30.     No medical provider employed by Wexford provided any care for Mr. Jurcich during the time he was placed medical segregation.

31.     Nurse Thurman did not inform Dr. Reddy that one of his patients had been readmitted and was in need of care.

**Officers Beat Mr. Jurcich Hours Before He Committed Suicide**

32.    On March 11, 2014, around 11:00 a.m., while Defendant Officer James D. Wagener was serving lunch trays to cell block AA, Mr. Jurcich came out of his cell and walked down the stairs to the dayroom.  Defendant Officer Wagener told Mr. Jurcich to return to his cell, but Mr. Jurcich refused, stating that he wanted to speak with the Lieutenant so that he could be removed from segregation.  Control room operator Officer Terrance E. Owens called on the radio for assistance, and Defendants Sergeant David Nichols, Officer Mark J. Harris, Officer Dante S. Beattie, Officer Thomas Mesey, and Officer Eric L. Walter responded to the cell block.

33.    Defendant Officers Wagener, Harris, and Beattie took ahold of Mr. Jurcich's jumpsuit and attempted to escort him back to his cell.  Mr. Jurcich refused to return to segregation, at which point the officers began to beat Mr. Jurcich.  Defendant Officer Mesey executed a pressure point hold by squeezing Mr. Jurcich's neck and face and Defendant Officers Harris and Walter slammed Mr. Jurcich to the floor.  Defendant Officer Walter used his knees to strike Mr. Jurcich throughout his body.  Witnesses reported that the officers eventually handcuffed Mr. Jurcich and slammed his head on the ground while he was handcuffed.

34.    According to the Defendant Officers, following the struggle, Defendants Officer Mesey and Lieutenant Nancy Sutherlin escorted Mr. Jurcich to the medical office.

**Placement in Disciplinary Segregation**

35.    Nurse Jana Reuter examined Mr. Jurcich and approved his placement in segregation.  If Nurse Reuter had instructed security staff that Mr. Jurcich's serious mental illness was counter-indicative for placement in segregation, the security staff would have placed Mr. Jurcich in a more appropriate housing unit.  Because she failed to do so, Mr. Jurcich was housed in segregation cell where his risk of suicide increased significantly.

10

36.     Nurse Reuter conducted a cursory, non-private mental health screening on Mr. Jurcich on March 11, 2014, a few hours before he attempted suicide.  During that screening, Mr. Jurcich reported that he been on "lots" of psychotropic medications.  Nurse Reuter indicated that Mr. Jurcich had ADHD, but did not indicate on this form that he had a previous diagnosis of Bi-polar disorder.  Nurse Reuter referred Mr. Jurcich for a routine mental health referral.

37.     During the screening, correctional officers were in the room.  Nurse Reuter knew that the presence of officers—particularly officers who are in conflict with a patient—would affect the accuracy of the screening.  She disregarded this fact and continued on with the screening.

38.      Nurse Reuter did not consider the significant psychiatric history documented in Mr. Jurcich's medical file during this screening which she had access to.

39.     Nurse Reuter did not ask Mr. Jurcich if the use of force he had just experienced was affecting his mental health status in any way.

40.     Nurse Reuter did not ask Mr. Jurcich how his withdrawal from heroin was affecting his mental health.

41.     Nurse Reuter herself had previously documented Mr. Jurcich's serious mental illness in October 2013, five months prior to completing the March 2014 screening.  Despite this fact, she disregarded Mr. Jurcich's psychiatric history during the March 2014 screening.

42.     Nurse Reuter did not inform Dr. Reddy that one of his patients had been readmitted and was in need of care.

43.     Nurse Reuter was aware that detainees who have a history of mental health issues are more at risk for suicide than detainees without such a history and that placement in segregation is a risk factor for suicide.

44.     Nurse Reuter received training from Wexford, her employer, instructing her that among other high risk factors, patients with mental disorders, patients who have been in the jail for less than a week, patients with drug addiction and patients who have been moved to segregated housing are at a high risk for suicide.  She knew that Mr. Jurcich fit each of these risk profiles, yet she ignore this evaluated risk and ordered Mr. Jurcich's placement in segregated housing without securing him mental health care.

45.     Nurse Reuter was aware that the physical structure of the cell in F-Max would have placed Mr. Jurcich at a significantly elevated risk of suicide.  F-Max cells have steel walls on three sides and a wall of bars that open into a three foot vestibule, which is secured by a solid steel door.  The solid steel door has a view port at eye level measuring approximately eight inches square.  The physical structure of the cell creates the effect of extreme isolation.  In authorizing Mr. Jurcich's placement in segregation, Nurse Reuter disregarded the risk this placement posed for Mr. Jurcich.

46.     After Mr. Jurcich was cleared by Nurse Reuter, Lieutenant Sutherlin, Sergeant Missey, Officer Patrick Fulton, and Officer Mesey escorted him to cell block F-Max, where he was re-housed in Cell #6.

## Failure to Provide Mr. Jurcich with any Mental Health Care During his March 2014 Incarceration

47.     Despite Mr. Jurcich's lengthy and well-documented history of psychiatric illness and his diagnoses of a serious mental illness, he received no mental health care during his March 2014 incarceration at the St. Clair County Jail.

48.     Dr. Reddy was the sole psychiatrist providing mental health services at the Jail in March 2014.  Dr. Reddy worked at the Jail on March 9, 2014 and on March 10, 2014, but he did

not provide any psychiatric services to Mr. Jurcich on either date, even though Mr. Jurcich was a long-time patient of Dr. Reddy's.

49.     Dr. Reddy had not established any process through which he could track his patients' readmissions to the Jail.  As a result, Dr. Reddy did not provide any care to Mr. Jurcich in the days before his suicide.

50.     Dr. Reddy knew that because of the nature of Mr. Jurcich's psychiatric history and his co-occurring addiction, Mr. Jurcich would be readmitted to the Jail and upon readmission, Mr. Jurcich would need psychiatric services that could have only been provided by Dr. Reddy.

51.     Despite having knowledge of Mr. Jurcich's need for psychiatric treatment for his serious mental illness, Dr. Reddy illustrated deliberate indifference to this need by failing to establish a tracking system that would inform him when his patients were readmitted.

52.     Had Dr. Reddy had such a system in place and had he provided Mr. Jurcich with psychiatric care on March 9, 2014 and/or on March 10, 2014, Mr. Jurcich's untreated psychiatric illness would not have resulted in his suicide on March 11, 2104.

**Mr. Jurcich's Suicide in Segregation**

53.     St. Clair County Jail has no formal policies, procedures, or regulations regarding suicide prevention.  Further, the employees at St. Clair County Jail are not adequately trained in suicide prevention—their training consists of one 8 hour class on mental health and suicide prevention.  Thus, Jail employees do not have the training or resources to sufficiently monitor and protect detainees who are at risk for suicide.

54.     Additionally, at all times relevant to the events at issue in this case, St. Clair County Jail was over capacity.  Specifically, on March 11, 2014, the day Mr. Jurcich committed suicide, the Jail was over-populated by 46 detainees.

55.      On information and belief, during this period of overcrowding, the Jail was also understaffed.  The understaffing contributed to the ineffective medical and mental health care at the Jail.

56.     On information and belief, the overcrowding at the Jail also contributed to poor and unsafe living conditions: the Jail was filthy; the toilets, sinks, and showers were unsanitary; inmates were denied cleaning materials; inmates were forced to sleep on the filthy floors; foul odors of human waste were prevalent; and the Jail was infested with rodents and insects.

57.     Mr. Jurcich exhibited several of the suicide risk factors—he was a young male with a history of mental health issues and substance abuse problems.  The overcrowding and poor living conditions at the Jail further exacerbated his mental health condition.

58.     Shortly after being placed in F-Max, Mr. Jurcich went back to the medical office to have a chest X-Ray as part of a TB screen.  After the X-Ray, Mr. Jurcich was escorted back to F-Max by Defendant Sergeant Nichols.  During this escort, video evidence shows that Mr. Jurcich and Sergeant Nichols were engaged in conversation.  When they reached the hallway outside of F-Max, they were joined by Officers Beattie, Harris, and Matthew Green.  The video shows Mr. Jurcich appearing hesitant to go back into the segregation unit—he backed up against the wall outside of F-Max as he was talking to the officers.  During this exchange, Sergeant Nichols appeared to mock Mr. Jurcich, and Mr. Jurcich responded with emphatic gestures.  Mr. Jurcich eventually walked back into F-Max at the direction of Sergeant Nichols, continuing to talk to the officers.

59.     While Mr. Jurcich was housed in F-Max, Defendant Officer Patrick Fulton was responsible for performing cells checks in the block during the day shift.  During the first cell check Defendant Officer Patrick Fulton conducted after Mr. Jurcich was placed in F-Max, he stopped in front of Mr. Jurcich's cell and briefly spoke to him.

60.     During Defendant Officer Patrick Fulton's cell check at around 1:53 p.m., he opened Mr. Jurcich's cell door, went inside the cell alone, and remained in Mr. Jurcich's cell for nearly five minutes.  It was not common practice for officers to go into a detainee's cell alone and remain in the cell for five minutes.

61.     The other cell checks Defendant Officer Patrick Fulton conducted that day in F-Max were not adequate—he rushed through the cell block and walked right by Mr. Jurcich's cell without looking inside.

62.     Defendant Officer Jon Knyff was responsible for performing cell checks in F-Max during the evening shift on March 11, 2014.  During Defendant Officer Knyff's first cell check at around 5:37 p.m., he stopped in front of Mr. Jurcich's cell and talked to Mr. Jurcich for almost a minute.  Then, after checking on the detainees in cell 7 and 8, Defendant Officer Knyff began to walk out of the block when he was called back by Mr. Jurcich.  Defendant Officer Knyff stood in front of Mr. Jurcich's cell again and talked to him for another twelve seconds.

63.     Defendant Officer Knyff rushed through his next two cell checks, walking right by Mr. Jurcich's cell.

64.     One detainee who was housed in F-Max along with Mr. Jurcich heard Mr. Jurcich express his suicidal ideations several times to the Defendant Officers who walked through F-Max that day.  This detainee heard Mr. Jurcich tell the officers, who included Defendants Knyff

and Fulton, that if he did not get to see the nurse or get a shower that he would kill himself. When Mr. Jurcich told one officer that he wanted to kill himself, the officer just kept walking.

65.     Another detainee who was housed in F-Max along with Mr. Jurcich heard Mr. Jurcich tell Defendant Officer Knyff that he was going to kill himself.  Defendant Officer Knyff ignored Mr. Jurcich's suicidal ideations and kept walking out of the block.

66.     The Defendants refused to accommodate Mr. Jurcich's disability by failing to immediately move him to a suicide-proof cell upon learning about Mr. Jurcich's intent to kill himself.

67.     The Defendants knew Mr. Jurcich was a suicide risk and they failed to take measures to monitor and protect him—they failed to provide him adequate mental health services, they failed to place him in a suicide-proof cell, and they failed to adequately conduct regular checks on him while he was in his cell.  By their actions, the Defendants intentionally disregarded the known and substantial risk that Mr. Jurcich would harm himself while in their custody.

68.     On March 11, 2014, around 6:40 p.m., Defendant Officer Jon Knyff discovered Mr. Jurcich hanging from his cell bars.  One end of a blue sheet was tied across the upper bar of the inner cell door and the other end was looped around Mr. Jurcich's neck.

69.     Mr. Jurcich was then alive but unconscious.  He was transported to St. Elizabeth's Hospital where he died two days later on March 13, 2014.

70.     As Superintendent of the Jail, Defendant Major Phillip McLaurin supervised all staff and managed all aspects of Jail operations.  On information and belief, Defendant Major McLaurin had knowledge of the beating Mr. Jurcich suffered while in cell block AA, his transfer

to a maximum security cell, and that Mr. Jurcich was a suicide risk.  Defendant McLaurin failed

to take any measures to monitor and protect Mr. Jurcich.

## COUNT I
### Failure to Protect in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983

71.      Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this

Count.

72.      Count I is alleged against Defendants Officer Steven Frierdich, Lieutenant Nancy

Sutherlin, Sergeant David Nichols, Officer Patrick Fulton, Officer Jon Knyff, and Major Phillip

McLaurin.

73.      Under settled United States Supreme Court authority, and in accordance with the

Fourteenth Amendment, Mr. Jurcich was entitled to be free from a known and unreasonable risk

of serious harm while in the custody of the St. Clair County Jail.

74.      In violation of the Fourteenth Amendment, the individual Defendants knew of and

disregarded a substantial risk of serious harm—that Mr. Jurcich would commit suicide.

75.      In the alternative, the individual Defendants disregarded an obvious risk of

serious harm or unreasonably disregarded a risk of serious harm.[1]

76.      The individual Defendants' above-described actions and omissions were

undertaken with malice and/or reckless disregard for Mr. Jurcich's constitutional rights.

77.      As a result of the unjustified and unconstitutional conduct of the individual

Defendants, Mr. Jurcich experienced pain, suffering, emotional distress, injury, and ultimately,

death.

---

[1]  This portion of the claim is pled on the basis of "a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  Fed. R. Civ. P. 11(b)(2).

78.     The Defendants' actions and omissions were the direct and proximate cause of the violations of Mr. Jurcich's constitutional rights, of Mr. Jurcich's death, and of the damages suffered by his heirs.

## COUNT II
### Excessive Force under 42 U.S.C. § 1983

79.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

80.     Count II is alleged against Defendants Officer Wagener, Officer Harris, Officer Beattie, Officer Mesey, and Officer Walter.

81.     These Defendants purposely or knowingly used force on Mr. Jurcich, and the force used was objectively unreasonable, when they tackled him to the floor, repeatedly kneed him while on the floor, and body slammed him while on the floor, all because Mr. Jurcich allegedly refused to return to his cell.

82.     These Defendants' above-described actions were undertaken with malice and/or reckless disregard for Mr. Jurcich's constitutional rights.

83.     These Defendants' actions were the direct and proximate cause of the violations of Mr. Jurcich's constitutional rights and of the damages suffered by Mr. Jurcich, including pain, suffering, emotional distress, and injury.

## COUNT III
### *Monell* Claim under 42 U.S.C. § 1983

84.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

85.     Count III is alleged against Defendant Sheriff Watson in his official capacity.

86.     In addition to Mr. Jurcich, two other detainees at St. Clair Count Jail committed suicide within the last two years:

(a) **Bradley C. Scarpi**, a thirty-three year old, committed suicide two months after Mr. Jurcich on May 23, 2014.  Mr. Scarpi hung himself hours after being re-housed in cell block E-Max, cell #5.

(b) **Damon E. Stidimire**, a nineteen-year-old, committed suicide on October 29, 2015.  Mr. Stidimire hung himself in cell block C, cell #4.

87.     Between January 2014 and October 2015, there were 14 suicide attempts at the Jail.

(a) **Rachel Mills** attempted suicide by tying a sheeting around her neck on January 4, 2014.

(b) **Jerry Davis** attempted suicide by tying a shoe string around his neck on May 20, 2014, three days before Mr. Scarpi committed suicide.

(c) **Preston Young** attempted suicide by tying a blanket around his neck on May 22, 2014, the day before Mr. Scarpi committed suicide.

(d) **Rodney Brown** attempted suicide by tying a sheet around his neck on July 10, 2014.

(e) **Trey Dayton** attempted suicide by tying a cord around his neck on October 9, 2014.

(f) **Michael Knepper** attempted suicide by cutting his wrist with a razor on three separate occasions: on November 7, 2014, on April 10, 2015, and on June 3, 2015.

(g) **Dante Dixon** attempted suicide by tying a sheet around his neck on January 1, 2015.

(h) **Jessica Hart** attempted suicide twice: once by tying a sheet around her neck on March 18, 2015, and a second time by tying chair straps around her neck on March 22, 2015.

(i) **Demarken Cobbs** attempted suicide by tying his pants around his neck on April 29, 2015.

(j) **Julianna Kavano-Mosley** attempted suicide by tying a sheet around her neck on July 11, 2015.

(k) **Carlos Rickman** attempted suicide by tying a sheet around his neck on August 9, 2015.

88.    On information and belief, St. Clair County Jail does not have any suicide prevention policies in place.

89.    During the relevant time period, Defendant Sheriff Watson had notice of widespread practices by employees at the St. Clair County Jail under which detainees with mental health issues were routinely denied access to proper mental health treatment, and detainees who were at risk of suicide were routinely denied access to safe and secure suicide prevention cells.  These widespread practices are a result of the lack of formal policies, training, and supervision on the proper way to deal with detainees with mental health problems.

90.    These widespread practices were allowed to flourish—and become so well settled as to constitute de facto policy of the St. Clair County Sheriff's Department—because governmental policymakers and authority over the same, namely, Sheriff Watson, exhibited deliberate indifference to the problem, thereby effectively ratifying it.

91.     Mr. Jurcich's injuries, and ultimately his death, were caused in substantial part by these widespread policies, practices, and procedures promulgated by the St. Clair County Sheriff's Department.  These policies, practices, and procedures that were the cause of Mr. Jurcich's death were also the cause of Mr. Scarpi's and Mr. Stidimire's deaths.

## COUNT IV
### Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132

92.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

93.     Count IV is alleged against Defendant Sheriff Watson in his official capacity.

94.     As described more fully in the preceding paragraphs, Mr. Jurcich is a qualified person with a disability under the Americans with Disabilities Act and his disability was known to the individual Defendants.  As a result, the Defendants had an obligation to accommodate his disability by housing him in a suicide-proof cell.  The Defendants intentionally failed to accommodate Mr. Jurcich's disability, and these failures led to Mr. Jurcich's death.

## COUNT V
### State Law Claim for Wrongful Death

95.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

96.     Count V is alleged against Defendants Officer Steven Frierdich, Lieutenant Nancy Sutherlin, Sergeant David Nichols, Officer Patrick Fulton, Officer Jon Knyff, and Major Phillip McLaurin.

97.     As described more fully in the preceding paragraphs, the individual Defendants knew that Mr. Jurcich had mental health problems and should be monitored as a suicide risk, but failed to have him under such watch, resulting in Mr. Jurcich's wrongful death.

98.     By their acts and omissions, the individual Defendants breached their duty to provide for Mr. Jurcich's health and safety and were the proximate cause of Mr. Jurcich's death and the injuries to his heirs.

99.     The individual Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Mr. Jurcich's rights.

100.     Mr. Jurcich's next of kin is his 13-year-old son, Josiah Parker.  Plaintiff, as administrator of the estate and on behalf of the next of kin, claims damages for the wrongful death of Mr. Jurcich, and for the loss of his services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel and advice, as well as for the mental anguish caused by this loss, as well as for funeral and other expenses and damages pursuant to 740 ILCS 180/1, commonly referred to as the Illinois Wrongful Death Act.

**COUNT VI**
**State Law Claim for Respondeat Superior**

101.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

102.     Count VI is alleged against Defendant Sheriff Watson in his official capacity.

103.     In committing the acts alleged in the preceding paragraphs, the individual defendants were employees, members, and agents of the St. Clair County Sheriff's Department, acting at all relevant times within the scope of their employment.

104.     Defendant Sheriff Watson is liable as principal for all torts committed by his agents.

**COUNT VII**
**State Law Claim for Indemnification**

22

105.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

106.    Count VII is alleged against Defendant St. Clair County.

107.    Illinois law provides that public entities are directed to pay ant tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

108.    The individual Defendants were employees of the St. Clair County Sheriff's Department who acted within the scope of their employment in committing the misconduct described above.

109.    St. Clair County is obligated to pay any judgment entered against Sheriff Watson in an official capacity.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Dawn Corbier, as Administrator of the estate of Joshua B. Jurcich, prays that this Court enter judgment in her favor against Defendants, awarding compensatory damages, costs and attorneys' fees, and punitive damages against each of the Defendants in their individual capacities, and for such further additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.


Dated: October 16, 2018

Respectfully submitted,

**DAWN CORBIER**

23

By: /s/ Vanessa del Valle
One of her attorneys

Locke E. Bowman
l-bowman@law.northwestern.edu
Sheila A. Bedi
sheila.bedi@law.northwestern.edu
David M. Shapiro
david.shapiro@law.northwestern.edu
Vanessa del Valle
vanessa.delvalle@law.northwestern.edu
Roderick and Solange MacArthur Justice Center
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271

LaToya M. Berry
Law Offices of LaToya M. Berry
901 West Main
Belleville, IL 62220
(618) 567-4837
missberry_esq@yahoo.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that she served the foregoing document upon all parties listed in the attached service list by electronic transmission on October 16, 2018.

   /s/   Vanessa del Valle