# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DAWN CORBIER, as Administrator of** ) | |
| **the ESTATE OF JOSHUA B. JURCICH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 16-CV-257-SMY-MAB** |
| **vs.** ) | |
| ) | |
| **ST. CLAIR COUNTY SHERIFF** ) | |
| **RICHARD WATSON,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Dawn Corbier is the Administrator of the Estate of Joshua Jurcich, Deceased, who attempted suicide while detained at the St. Clair County Jail in Belleville, Illinois on March 11, 2014 and died several days later. Plaintiff raises seven claims in the Third Amended Complaint: Count I asserts a claim under 42 U.S.C. § 1983 for the failure to protect Jurcich from the risk of suicide against several individual defendants employed by St. Clair County; Count II asserts an excessive force claim under 42 U.S.C. § 1983 against Defendants Wagener, Harris, Beattie, Mesey and Walter; Count III asserts a claim under 42 U.S.C. § 1983 against Sheriff Watson in his official capacity as provided in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); Count IV asserts a claim against Sheriff Watson in his official capacity under the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12132; Count V asserts a wrongful death claim under Illinois state law against the Jail Officer Defendants; Count VI asserts that Sheriff Watson is liable in his

official capacity for "all torts committed by his agents" under a theory of *respondeat superior*; and Count VII asserts an indemnification claim against Defendant St. Clair County.[1]

This matter is now before the Court for consideration of the Motion for Summary Judgment (Doc. 190) filed by Defendants Sheriff Richard Watson, Major Phillip McLaurin, St. Clair County, Officer Steve J. Frierdich, Officer James D. Wagener, Sergeant David Nichols,[2] Officer Mark J. Harris, Officer Dante S. Beattie, Officer Thomas Mesey, Officer Eric L Walter, Lieutenant Nancy Sutherlin, Officer Patrick Fulton, and Officer Jon Knyff. Plaintiff filed a Response (Doc. 202) and Defendants filed a Reply (Doc. 226). For the following reasons, the Motion is **GRANTED IN PART and DENIED IN PART**.

## Factual Background

Joshua Jurcich was arrested for possession of a controlled substance and taken to the St. Clair County Jail ("the Jail") on March 6, 2014. (Doc. 195-1). Jurcich had previously been detained at the Jail 16 times over a 16-year period. (Doc. 267). Plaintiff testified during her deposition the Jurcich was depressed, frustrated, and stressed the last six months of his life. (Doc. 205-45 at 47:08-12 and 67:01-13). Jurcich's fiancée, Sarah Parker, testified that during the same period, Jurcich was "really depressed and emotional", that there were times he would be laughing and then crying, that there were times he "wouldn't be there and then he would be there[,]" and that his emotions changed "like a light switch." (Doc. 206-46 at 84:16-85:15). Sarah Paul, the mother of Jurcich's son, testified that she observed him in depressed moods, that he told her a number of times he could not handle everything going on in his life and just wanted to be done

---

[1] The Third Amended Complaint eliminates a previously-filed claim against Wexford Health Sources Inc. and some of its employees, but does not change the substance or application of the instant motion.

[2] The Court recently granted Defendant David Nichols' Motion to Dismiss the claim asserted against him in Count I of the Third Amended Complaint (Doc. 286).

with everything, and that he stated he felt like killing himself a number of times. (Doc. 206-47 at 128:07-131:05, 131:09-132:18 and 134:02-25).

On March 24, 2008, during one of Jurcich's previous detentions at the Jail, he was diagnosed by the Jail's psychiatrist (Dr. Reddy) with Bipolar I Mood Disorder. (Doc. 214-5 at 3). On October 15, 2013, during another detention, Jail mental health counselor Andrea Dobbins conducted a mental health assessment on Jurcich and noted diagnoses of Bipolar Disorder, Attention Deficit Hyperactivity Disorder and Substance Abuse. (Doc. 214-7 at 3). Dr. Reddy evaluated Jurcich on October 20, 2013, and again diagnosed Bipolar Disorder. (Doc. 214-8).

## March 6, 2014 Detention

According to Jail policy, before an individual may be detained in the St. Clair County Jail, they must proceed through booking. Under the written booking process, an arresting officer transports the individual to the Jail where the booking officer obtains or confirms information on the detainee, including whether they have immediate medical needs, previous booking information and photographs, and reviews the individual's current medical and mental health status. (Doc. 195-2 at 57-62; 20 Ill. Adm. Code 701.40). This information is to be recorded on a standard "Field Booking Form." (Doc. 195-1). The Field Booking Form includes sections titled "Cautions" and "Brief Mental Health Screen" for which the officer completing the form asks the detainee about potential risk factors for suicide and common symptoms of mental illness, such as whether the detainee has felt useless or sinful for the preceding few weeks, is having to move or talk more slowly than he or she normally does, etc. (Doc. 195-1). The booking officer signs the Field Booking Form and indicates whether the detainee should be referred to "medical" (which includes physical and mental health referrals) based on the detainee's physical condition and responses.

(Docs. 195-1; 195-3 at 45:13-47:10). There is no follow-up of a referral to determine whether a detainee is actually seen by medical staff. (Doc. 195-3 at 57:22-58:11, 69:23-70:05).

In practice, much of the information on the Field Booking Form is obtained and recorded by the arresting officer rather than the booking officer. (Doc. 195-3 at 45:13-47:01; Doc. 206-2 at 99:01-10). The booking officer will ask the Brief Mental Health Screen questions if the answers have not been recorded. (Doc. 195-3 at 45:13-47:10). The determination of whether an incoming detainee is referred to medical is based solely on the information provided to the booking officer during the booking process; the booking officer does not consult records from prior bookings, although that information is available to them. (Id. at 66:23-69:13).

Jurcich was booked into the Jail on March 6, 2014 by Officer Steven Frierdich. The Field Booking Form was completed by the arresting officer. (Id. at 122:17-123:9). The completed Form indicates that Jurcich denied feeling suicidal, but responded "yes" to Questions 5 ("Do you currently feel that you have to move or talk more slowly than you usually do?) and 6 ("Have there currently been a few weeks when you felt like you were useless or sinful?"). (Doc. 195-1). Frierdich referred Jurcich to medical. (Id.; Doc. 195-3 at 262:9–263:15). At the time of Jurchich's March 2014 detention, medical and mental health services at the Jail were provided by Wexford Health Sources, Inc. ("Wexford") through its employees.

Jurcich was seen by Wexford's nurse, Sandra Thurman, on March 9, 2014 and reported that he was "dope sick" and had scabies. (Docs. 198-1; 198-2 at 45:9–46:21). He did not report feeling suicidal. (Doc. 198-2 at 49:9–50:4). Thurman directed that Jurcich be placed in medical segregation due to his complaint of scabies. (Id.).

On March 11, 2014, Jurcich's cell was opened to pass him a lunch tray. When Jurcich received his tray, he walked down the stairs to the dayroom. Officer Wagener verbally ordered

Jurcich to return to his cell, but Jurcich refused. (Docs. 195-10, 11). Wagener approached Jurcich and again told him to return to his cell, but Jurcich refused. (Doc. 195-10). Officer Terrance Owens observed the situation and radioed for assistance. (Doc. 195-11). Officers Dante Beattie, Mark Harris, Thomas Mesey, Eric Walter, and Sergeant David Nichols responded. (Docs. 195-12 to 195-15). The officers' incident reports and the surveillance video of the incident show that the officers used force on Jurcich, including multiple knee strikes, an arm bar and an attempt to apply pressure to Jurcich's hypoglossal nerve. There is a dispute as to whether Jurcich was struggling or kicking during the incident. Jurcich was handcuffed and taken to the medical office. (Doc. 195-14).

At the medical office, Jurcich was seen by Nurse Jana Reuter who conducted a complete medical screening that included Jurcich's vital signs and medical history. Reuter also performed a mental health screening and evaluation, including a "Suicide Potential Screening". (Doc. 198-3). During the evaluation, Jurcich was asked whether he took psychotropic medications, to which he answered "lots." He also reported that he was a heroin user. (Id.). During the Suicide Potential Screening, the detainee is asked whether they "[are] thinking of killing self", whether there were any previous suicide attempts, whether the detainee "has a suicide plan and/or suicide instrument in possession" and whether the detainee "feels there is nothing to look forward to in the future[.]" (Doc. 198-3). The form indicates that Jurcich answered "no" to these questions. (Id.). Jurcich did not express suicidal ideation or give any indication he was feeling suicidal during the evaluation. (Docs. 198-3; 198-4 at 96:8–20). At the conclusion of the mental health screening and evaluation, Nurse Reuter approved Jurcich for placement in general population and checked the box for "Mental health problems requiring routine follow-up". (Docs. 198-3; 198-4 at 94:14 to 95:2).

Lieutenant Nancy Sutherlin was present during the medical screening and mental health evaluation conducted by Reuter. According to Sutherlin, Reuter's approval for Jurcich to be placed in general population allowed for his placement in a Maximum Security area ("F-Max"). (Doc. 195-6 at 243:7-24). Prior to placing Jurcich in Cell 6 in F-Max, Sutherlin reviewed his records for the March 2014 detention, including the Field Booking Form containing the "mental" notation. (Doc. 195-6 at 69:3-70:12). Jurcich was taken back to the medical office for a chest x-ray and was returned to F-Max by Sergeant Nichols at approximately 1:00 p.m. (Id.).

The St. Clair County Jail Policy and Procedures require that an officer conduct cell checks at least every 30 minutes during which they should be: "A. Observing detainees' actions/behavior; B. Listening to any comments detainees are saying at the time; C. Looking for any tampering of the physical parts of the jail." (Doc. 195-2 at 9-10). In the case of maximum security areas, the officers believe they are required to stop in front of every cell and look inside the cell to visually observe each detainee. (Doc. 206-26 at 32:08-33:14).

Officer Patrick Fulton was responsible for performing cell checks in the F-Max area during the day shift of March 11, 2014. (Id. at 33:15-34:10). He stopped outside Jurcich's cell and spoke with him during one cell check, and entered Jurcich's cell for approximately five minutes during another check. (Doc. 206-26 at 45:24-48:01 and 74:18-78:22).

Officer Jon Knyff was responsible for conducting cell checks in F-Max during the evening shift on March 11, 2014, which began at 5:45 p.m. (Doc. 195-20 at 97:16–24). Knyff conducted checks at approximately 5:49 p.m. and 6:16 p.m. (Doc 195-21). During the first check, Knyff stopped in front of Jurcich's cell and talked to him. (Doc. 195-20 at 178:1-179:4). According to Knyff, the conversation involved whether Jurcich wanted a shower and razors. (Id. at 181:1-10). Knyff discovered Jurcich hanging in his cell at approximately 6:40 p.m. (Id. at 131:4-132:8 and

144:2-10; Doc. 206-22) and radioed for immediate assistance. (Doc. 195-20 at 152:23–24). Jurcich was taken to St. Elizabeth's Hospital in Belleville, Illinois. He died two days later, on March 13, 2014.

Gabriel Boyd, a detainee who was housed in F-Max Cell #1 on March 11, 2014, submitted an Affidavit in which he states that he heard Jurcich tell "almost every officer who walked through F-Max" that he was going to kill himself, and tell at least one officer that if he didn't get to see the nurse or get a shower, he was going to kill himself. (Doc. 206-28). Ramone Parker, who was housed in F-Max, Cell #3, submitted an Affidavit and testified by deposition that he heard Jurcich tell Knyff he was going to kill himself, and that Knyff kept walking. (Docs. 206-29; 206-30 at 98:1-99:12). Knyff recorded in his incident report that after Jurcich had been taken out and pictures of the cell were taken, Boyd told him that "Jurcich said he was going to hang himself and that if I kill myself it be bogus I can't get me no shower." (Doc. 206-22).

At the time Jurcich was detained in March 2014, the Jail's Policy and Procedures Manual contained a policy titled, "Quiet Room/Suicide Watch Policy and Procedure." The policy provided guidance for placing suicidal detainees in a housing unit referred to as the Quiet Room, removing items they may use to harm themselves, and instituting various levels and intervals of monitoring. (Doc. 195-2 at 18-21). Under the policy, if a Jail employee identifies a detainee as potentially suicidal, the detainee is to be placed in the Quiet Room for observation, medical staff is to be notified, and a psychological referral is to be made. Once a detainee is housed in the Quiet Room, a Wexford counselor is to visit him every day and to make a recommendation to security staff about whether he should stay in the Quiet Room or be released to the general population. A detainee is to be removed from the Quiet Room and housed in general population only if medical staff determines it is safe to do so. The Quiet Room policy does not address the formulation or

implementation of treatment plans. There is no other interactive process by which mental health staff and Jail staff exchanged information about a detainee's mental health.

St. Clair County conducts annual training on use of force and mental health for its officers. The training records reflect that the individual defendants received Jail mental health and suicide training prior to Jurcich's suicide attempt. (Doc. 195-30).

As Jail Superintendent, Major Phillip McLaurin is responsible for safety and security for the entire Jail. (Doc. 206-31 at 8:20-24). McLaurin interacts with Sheriff Watson "basically daily" about Jail operations, and they meet two to three times per week. (Id. at 12:23-13:09, Doc. 206-44 at 63:18-64:08). McLaurin and Watson are responsible for establishing Jail policies. (Doc. 206-31 at 16:20-17:07). McLaurin (in consultation with training officers, shift supervisors etc.) reviews Jail policies and approves them. Watson signs off on the policies. (Id. at 17:05-18:01).

Based on population records, the Jail had been over its rated capacity since at least August 2013. (Doc. 206-42). Officer Fulton testified that the Jail had been short-staffed since he has been there, and that being short-staffed makes it difficult for officers to take their time when performing their duties and responsibilities, including cell checks. (Doc. 206-26 at 129:17-130:04).

Sheriff Watson is notified after every suicide or attempted suicide. (Doc. 206-44 at 72:02-15). There were several suicide attempts at the Jail prior to March 2014 (Docs. 213-1- 213-11).

## Legal Standard

Summary judgment is appropriate if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving

party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). When deciding a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

<u>Discussion</u>

**Count I: Failure to Protect**

Plaintiff claims that Defendants Frierdich, Sutherlin, Fulton, Knyff and McLaurin violated Jurcich's constitutional rights in that they knew or should have known that he was a danger to himself and at risk for suicide, but failed to protect him. Because Jurcich was a pretrial detainee and not an inmate, Plaintiff's claim arises under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment's Cruel and Unusual Punishment Clause. *See*, *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015); *Miranda v. County of Lake*, 900 F.3d 335, 350-351 (7th Cir. 2018).

Under *Kingsley* and *Miranda*, in order to prove a failure to protect claim, a plaintiff need only establish that the defendant's conduct was objectively unreasonable – not that the defendant was subjectively aware that it was unreasonable. *Miranda*, 900 F.3d at 352-53. In other words, a plaintiff must show that a defendant "knew, or should have known, that [a] condition posed an

excessive risk to health or safety" of the detainee and "failed to act with reasonable care to mitigate the risk." *Id.* This is a more exacting standard than that required to prove negligence, or even gross negligence and is "akin to reckless disregard." *Id.*

Obviously, suicide poses an excessive risk to health and safety. Therefore, the question presented is whether based on the evidence contained in the record, a jury could reasonably conclude that the defendants knew or should have known Jurcich was at a substantial risk for suicide and failed to exercise reasonable care to protect him from that risk. This is a relatively high bar. See *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) (jail officials who were informed that decedent had recently been at a mental health facility, was a potential risk for suicide, and exhibited strange behavior while at the jail was not enough to put officials on notice that there was a significant likelihood that he would attempt to harm himself). Plaintiff must prove that the defendants had actual knowledge of facts sufficient to at least support an inference that Jurcich was at a substantial risk for self-harm or suicide.

There is insufficient evidence that Defendant Frierdich was aware of facts or information that should have put him on notice of a substantial risk that Jurcich would harm himself. Although Frierdich reviewed Jurcich's Field Booking Form which noted a "Caution" condition of "Mental" (but not "Suicidal") and "Yes" answers to two of the Brief Mental Health Screening questions, there is no evidence that Jurcich told him he was considering harming himself or behaved in any way that should have alerted Frierdich that the Field Booking Form was inaccurate in that regard.

Similarly, there is no evidence that Sutherlin was aware of facts that should have alerted her to a significant risk of Jurcich attempting suicide. She was present during the mental health evaluation and screening conducted by Nurse Reuter on March 11, 2014, after which Reuter approved Jurcich for placement in general population (declining to mark "Suicide Precaution

Procedures: Mental Health Referral ASAP"), and issued a routine mental health referral (checking the box for "Mental health problems requiring routine follow-up" rather than "Suicidal"). Jail officers are generally entitled to defer to the judgment of health professionals. See, *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). The fact that Sutherlin was present when Jurcich reported that he had "lots" of history with psychotropic medications and was a heroin user does not overcome her justified reliance on Nurse Reuter's assessment that he was not suicidal at that time or indicate that she should have known otherwise. Plaintiff argues that Jurcich's altercation with the Jail officers was uncharacteristic and should have alerted Sutherlin that his behavior was "out of the ordinary." But strange or bizarre behavior is insufficient to put a jail official on notice of potential suicidality. E*state of Novack*, 226 F.3d at 530.

By contrast, the evidence does raise genuine issues of material fact as to whether Defendants Fulton and Knyff knew or should have known there was a substantial risk that Jurcich would harm himself and failed to act reasonably. Both defendants spoke with Jurcich in the hours leading up to his suicide attempt, and Gabriel Boyd, who was in another F-Max cell, claims to have heard Jurcich tell "almost every officer" who came through the area that he was going to kill himself, and tell at least one officer that if he did not get to see a nurse or get a shower, he would kill himself. Similarly, Ramone Parker, who was also housed in F-Max at the time, has testified that he heard Jurcich tell Knyff he was going to kill himself. While Defendants argue that Boyd and Parker's statements and testimony are not credible and should be disregarded, when deciding whether summary judgment is warranted, the Court may not make credibility determinations or weigh the evidence, and "must avoid the temptation to decide which party's version of the facts is more likely true." *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 798 (7th Cir. 2018) (quotation omitted).

Likewise, Defendant McLaurin, as the Jail Superintendent responsible for implementing and enforcing Jail policies and procedures, isn't entitled to summary judgment on Count I. A senior jail official, including a person with final policymaking power, can be individually liable for a detainee's injury if he is "aware of a systemic lapse in enforcement of a policy critical to ensuring inmate safety" and fails to enforce the policy. *Daniel v. Cook Cty.*, 833 F.3d 728, 737 (7th Cir. 2016) (citation omitted). "Similarly, if a supervisor designed or is aware of the institution's 'deliberately indifferent policy that caused a constitutional injury, the individual liability might flow from that act." *Id.* There is evidence from which a reasonable jury could find Mclaurin knew or should have known that some of the Jail policies and procedures designed to address the risk of self-harm or suicide were systemically deficient as implemented and/or enforced, but did not act reasonably to address them.

## Count II: Excessive Force

Plaintiff asserts that Defendants Wagener, Beattie, Harris, Mesey and Walter violated Jurcich's Fourteenth Amendment rights by using excessive force against him for allegedly refusing to return to his cell. To prevail on an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S.Ct. at 2472–73. This determination "turns on the facts and circumstances of each particular case," including "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 2473 (quotations and citation omitted).

It is undisputed that these defendants used force purposely or knowingly on Jurcich when he was taking his lunch tray to the dayroom. Defendants note that Jurcich appears to have suffered no injuries from the altercation, but that fact alone is not dispositive. *See Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 687 (7th Cir. 2007) ("A factfinder might conclude that [plaintiff's] injuries were slight but nonetheless find that [the officer] employed more force than was justified."). A reasonable jury could conclude that multiple knee strikes, an arm bar and an attempt to apply pressure to the hypoglossal nerve near Jurcich's neck were excessive, especially if the jury determines that Jurcich was not kicking or actively struggling. Therefore, summary judgment will be denied on Count II.

### Count III: Monell Claim

Plaintiff alleges that Watson "had notice of widespread practices by employees at the St. Clair County Jail under which detainees with mental health issues were routinely denied access to proper mental health treatment, and detainees who were at risk of suicide were routinely denied access to safe and secure suicide prevention cells. These widespread practices are a result of the lack of formal policies, training, and supervision on the proper way to deal with detainees with mental health problems." (Doc. 267 at ¶ 89). *See Franklin v. Zaruba*, 150 F.3d 682, 686 (7th Cir. 1998) ("§ 1983 suits against sheriffs in their official capacities are in reality suits against the county sheriff's department"). She also alleges that these practices "constitute de facto policy of the St. Clair County Sheriff's Department…because governmental policymakers and authority over the same, namely, Sheriff Watson, exhibited deliberate indifference to the problem, thereby effectively ratifying it." (Id. at ¶ 90).

A local governmental body, such as a county or other municipal corporation, can be held liable under § 1983 if (1) it had an express policy calling for constitutional violations, (2) it had a

widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law or (3) if a person with final policymaking authority for the body caused the constitutional violation. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). Such an entity is liable only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is the moving force behind the constitutional violation. *Monell*, 436 U.S. at 694.

A plaintiff must show that municipal policymakers were "deliberately indifferent as to [the policy or custom's] known or obvious consequences…" meaning, "a reasonable policymaker [would] conclude that the plainly obvious consequences" of the municipality's actions would result in the deprivation of a federally protected right. *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 406–07, 411 (1997) (quotations omitted). "A showing of simple or even heightened negligence will not suffice." *Id. Monell* liability is possible even if no individual official is found deliberately indifferent. *Miranda*, 900 F.3d at 344; *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*).

Plaintiff first contends that the booking process routinely failed to identify detainees in need of mental health treatment so that they would be referred for mental health treatment because (1) the caution questions and the "Brief Jail Mental Health Screen" were completed by the arresting officer, who was unlikely to get candid answers, (2) it did not include a search of mental health information from previous detentions at the Jail, and (3) it did not require any tracking of referrals to medical or follow-up to ensure mental health evaluation was actually received. She maintains that Jurcich's suicide could have been prevented if these deficiencies had not existed. Watson argues that the Jail's policies -- including policies to identify mental health needs, to address

potential suicidal detainees, and to contract with Wexford to have qualified Wexford medical personnel treat detainees' mental illnesses – are adequate and comply with the County Jail Standards, 20 Ill. Admin. Code § 701.5 *et seq.* (2013).

For *Monell* liability to attach, "it is not enough to show that a widespread practice or policy was a factor in the constitutional violation; it must have been the moving force." *Johnson v. Cook Cty.,* 526 F. App'x 692, 696 (7th Cir. 2013) (*citing Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) and *LaMarca v. Turner*, 995 F.2d 1526, 1538 (10th Cir. 1993)). Here, based on the undisputed fact that Jurcich was formally screened for mental health issues and suicidality by a healthcare professional (Nurse Reuter) after he had been booked into the Jail, no reasonable jury could find that any deficiencies in the Jail's booking process were the "moving force" behind the claimed deprivation of a constitutional right (Jurcich's right to be protected from the risk of suicide). While it is conceivable that better questioning and a search of Jurcich's prior booking records might have yielded some warning of a fragile mental state, Nurse Reuter's subsequent screening negates any necessary causal connection between any such deficiencies and Jurcich's suicide attempt. As such, summary judgment is appropriate as to Plaintiff's claim relating to the booking process.

Next, Plaintiff argues that the practice of conducting mental health evaluations on detainees with a correctional officer present was constitutionally infirm and constituted deliberate indifference. The thrust of Plaintiff's argument is that having an officer present makes detainees less likely to honestly answer questions about suicidality. Because there is no evidence that Lieutenant Sutherlin's presence during Nurse Reuter's screening affected Jurcich's willingness to discuss suicidal potential, summary judgment is also warranted as to this theory.

Plaintiff also attacks the adequacy of the Quiet Room policy and its enforcement. Specifically, she argues it is not a "suicide prevention policy" because it addresses only what a Jail officer should do if a detainee says he is suicidal or if he attempts suicide, and does not address how an officer should identify and deal with potentially suicidal inmates. She also takes issue with the failure of the Quiet Room Policy to require the creation of treatment plans and communications between Jail staff and Wexford's mental health staff.

The evidence in the record raises a genuine issue for the jury's determination as to whether the Quiet Room Policy was inadequate, either as drafted or as implemented, and whether the Sheriff's Department was deliberately indifferent to the potential consequences. While there were no suicides at the Jail before Jurcich's death, there were several significant attempts dating back to at least 2005. In arguing that the policy is effective, Sheriff Watson points out that the detainees who attempted suicide were not on suicide watch when they made their attempts, that they were subsequently placed in a Quiet Room environment after their attempt, and that they subsequently received mental health evaluation. But this is only one of two inferences that could be drawn. The other is that the policy is inadequate and was the moving force behind staff failing to identify at risk detainees and to put them on suicide watch before they attempted suicide. The fact that "only" three detainees succeeded in committing suicide does not necessarily vindicate the system. The record shows that Watson was aware of every suicide attempt at the Jail, and that the Quiet Room Policy was not revised after these incidents. Should the jury conclude that the policy was inadequate, it could also reasonably find that the failure to revise the policy under the circumstances amounted to deliberate indifference. Therefore, summary judgment is inappropriate with regard to Plaintiff's *Monell* claim based on the inadequacy of the Quiet Room policy.

Plaintiff claims that understaffing was a widespread practice at the Jail and was also a moving force in the constitutional violation, because officers were forced to spend less time observing detainees for potential problems during cell checks. There is evidence that at the time in question, the Jail had been over its rated population capacity since at least August 2013. (Doc. 206-42), and Officers Fulton specifically testified that the Jail had been short-staffed since he had been there, and that being understaff made it difficult for officers to take their time when doing all their responsibilities, like cell checks. (Doc. 206-26 at 129:17-130:04). Based on this evidence, a reasonable jury could find that understaffing was a cause… a moving force in the staff's failure to protect Jurcich from the risk of suicide. Summary Judgment is denied on this basis.

Finally, Plaintiff faults Watson and the Sheriff's Department for not conducting an adequate internal post-suicide investigation after Jurcich was taken to the hospital. The adequacy of any internal investigation conducted after Jurcich's suicide attempt is irrelevant to the question of whether these defendants were deliberately indifferent relative to Jurcich. There is no evidence of a widespread pattern or practice of failing to conduct post-suicide attempt investigations that could have been a moving force behind a failure to prevent Jurcich from attempting to take his life. Summary judgment is also warranted on this theory.

For the above-stated reasons, Plaintiff may proceed to trial on Count III with respect to her claims based on the inadequacy of the Quiet Room Policy and understaffing.

### *Count IV: Americans with Disabilities Act*

Title II of the Americans with Disabilities Act ("the ADA"), provides that no qualified person with a disability shall "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. §12132. Plaintiff alleges that Jurcich was mentally ill, that the Sheriff's Department was aware of it, and that it intentionally failed to accommodate that disability.

The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual" (42 U.S.C. § 12102(1)(A)), and the definition is to be construed "in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," as well as major bodily functions. 42 U.S.C. § 12102(2). Relatedly, the regulations promulgated pursuant to the Act define "mental impairment" as "[a]ny mental or psychological disorder, such as an intellectual disability (formerly termed 'mental retardation'), organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

Disability discrimination can be established by showing either that: "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592–93 (7th Cir. 2018) (quotation omitted). To prevail on the second basis – for failure to accommodate a disability – a plaintiff must prove that (1) he is a qualified person, (2) he has a disability and (3) the defendant denied him access to a program or activity because of his disability by failing to make a reasonable accommodation or modification. *See Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) (under the essentially identical Rehabilitation Act).

Jurcich was diagnosed with bipolar disorder during two prior detentions at the Jail; once by Dr. Reddy in 2008 and once by a mental health screener in 2013 whose diagnosis was then confirmed by Dr. Reddy. Citing *Leonard v. Uhlich Children's Advantage Network*, 481 F. Supp. 2d 931, 937-38 (N.D. Ill. 2007) (where plaintiff claimed that his bipolar condition interfered with his sleeping, eating, concentration, and caring for his own basic needs, the court found that there was "a genuine issue of material fact as to whether [plaintiff] was substantially limited in a major life activity, and therefore disabled within the meaning of the ADA"). Plaintiff argues that Jurcich's bipolar disorder did in fact substantially limit him in one or more major life activities. Specifically, Plaintiff points out, "[a]s indicated in Mr. Jurcich's medical records, his bipolar disorder caused him to experience mood swings, depression, anxiety, and insomnia. Additionally, his mother, girlfriend, and mother of his child all testified that they witnessed Mr. Jurcich experience severe bouts of depression. All these symptoms resulted in Mr. Jurcich experiencing suicidal ideations and eventually taking his own life." (Doc. 202 pg. 39).

While there is some evidence that Jurcich was depressed and experienced mood swings and anxiety during his March 2014 detention, there is no evidence that these conditions or bipolar disorder substantially limited or impaired his ability to care for himself, perform manual tasks, see, hear, eat, sleep, walk, stand, lift, bend, speak, breathe, learn, read, concentrate, think, communicate, work, or impacted his major bodily functions during the detention. Even construing "disability" broadly as the Court must do, there is insufficient evidence to conclude that Jurcich was disabled under the ADA. Summary Judgment is therefore granted as to Count IV.

### Count V: Illinois Wrongful Death Statute

Defendants Frierdich, Sutherlin, Fulton, Knyff and McLaurin challenge Plaintiff's claim under the Illinois Wrongful Death Act (740 ILCS 180/1, *et seq.*), on the basis that suicide negates

liability.  Under that statute, the plaintiff must establish "(1) defendant owed a duty to decedent; (2) defendant breached that duty; (3) the breach of duty proximately caused decedent's death; and pecuniary damages arising therefrom to persons designated under the Act." *Thompson v. City of Chicago,* 472 F.3d 444, 457 (7th Cir. 2006) (*quoting Leavitt v. Farwell Tower Ltd. P'ship*, 625 N.E.2d 48, 52 (1993)).  Generally, a defendant's negligence is wholly mitigated by a decedent's suicide, because suicide "is an independent intervening act which is unforeseeable as a matter of law, and which breaks the chain of causation from the tortfeasor's negligent conduct." *Turcios v. DeBruler Co.*, 2015 IL 117962, ¶ 20, 32 N.E.3d 1117, 1123 (2015).  That is not the case, however, where the defendant had a duty to the decedent to prevent his or her suicide. *Id.* at 1124. *See also See Jutzi-Johnson v. United States*, 263 F.3d 753, 756 (7th Cir. 2001) ("[T]he doctrine of supervening cause is not applicable when the duty of care claimed to have been violated is precisely a duty to protect against ordinarily unforeseeable conduct.").

Law enforcement officials, including jail officers and officials, owe a duty under Illinois law to protect detainees from "self-injury or self-destruction" by using "ordinary and reasonable care for the preservation of their prisoner's health and life under the circumstances of the particular case." *Hayes v. City of Des Plaines*, 182 F.R.D. 546, 549 (N.D. Ill. 1998) (*quoting Dezort v. Village of Hinsdale*, 342 N.E.2d 468, 472–73 (Ill. App. 1976)).  Plaintiff's wrongful death claim is therefore not excluded, and summary judgment is denied.

### Count VI: Respondeat Superior

Under the doctrine of *respondeat superior*, a principal may be liable for the tortious actions of its agent. *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 61, 39 N.E.3d 595, 617 (2015).  Defendant Watson argues that he cannot be held liable on Plaintiff's wrongful death claim under a *respondeat superior* theory because a claim under the Illinois Wrongful Death Act is

statutory and not a common law tort. There is no legal basis for such a narrow reading of the doctrine; such claims are permitted and are, in fact, common. *See White v. Watson*, No. 16-CV-560-JPG-DGW, 2018 WL 2047934, at *15 (S.D. Ill. May 2, 2018) (collecting cases). As such, summary judgement is denied on Count VI.

## Count VII: Indemnification

Defendant St. Clair County requests summary judgment on Plaintiff's claim for indemnification, which seeks to have the County pay any damages assessed against the other defendants. The County argues that the claims for which damages might be assessed are subject to summary dismissal. Because the Court has previously ruled that some of the claims remain for trial, St. Clair County is not entitled to summary judgment on Count VII.

## Immunity

Defendants contend that they are entitled to immunity for state law claims based on the Illinois Tort Immunity Act (745 ILCS 10/1-100 *et seq.*) and are entitled to qualified immunity for all claims. First, Defendants argue that under the Local Government and Governmental Employees Tort Immunity Act ("Tort Immunity Act"), 745 ILCS 10/1-101 *et seq,* St. Clair County and Watson are entitled to absolute immunity from liability for Plaintiff's wrongful death claim. The applicable section of the Tort Immunity Act provides that a local public entity is "not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. Because the individual officer defendants are not entitled to summary judgment on Plaintiff's wrongful death claim, the Tort Immunity Act cannot shield St. Clair County or Watson from liability.

Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013)

(*citing Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)). "Once a defendant asserts qualified immunity, the plaintiff can proceed only if she can show two things: first, that the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and second, that the right was clearly established at the time of the alleged violation." *Hurt v. Wise*, 880 F.3d 831, 840–41 (7th Cir.) (*quoting Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017)). Neither St. Clair County, a municipal corporation, nor Sheriff Watson, who is being sued in his official capacity only, can assert qualified immunity. *See Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001) (official capacity suits) and *Owen v. City of Indep., Mo.*, 445 U.S. 622, 650 (1980) (municipal corporations).

As the Court has previously determined, the evidence, viewed in the light most favorable to Plaintiff, is sufficient to support § 1983 claims against Defendants Fulton, Knyff and McLaurin for deliberate indifference and against Wagener, Beattie, Harris, Mesey and Walter for the excessive use of force. Therefore, the relevant question is whether the constitutional rights in question were clearly established on or about March 11, 2014. Plaintiff must establish that the "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013).

Before 2015, claims for the excessive use of force or deliberate indifference to a medical need brought by pretrial detainees were treated in essentially the same manner as those brought by convicted prisoners, whose rights arose under the Eighth Amendment. Under those standards, the core inquiry for an excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). There is also a subjective element which requires a finder of fact to "inquire into [the] prison official's state of mind" to determine

whether a constitutional violation has occurred. *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (quotation omitted). Similarly, the Eighth Amendment "deliberate indifference" standard for medical issues requires a showing that the defendant had a "sufficiently culpable state of mind" and a determination as to whether the official actually believed there was a significant risk of harm. *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775–76 (7th Cir. 2014).

In 2015, the Supreme Court found that a different standard applied to a prisoner, who is only entitled to be free from cruel and unusual punishment, and a person who has not been convicted at all; "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley,* 135 S.Ct. at 2475. *Kingsley* thus eliminated the subjective portion of the inquiry so that to prevail on an excessive force claim under the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473. In *Miranda*, *supra,* the Seventh Circuit extended the reasoning in *Kingsley* to deliberate indifference to a serious medical need claims by pretrial detainees.

Here, the individual defendants are not entitled to qualified immunity under the pre-*Kingsley* standards that applied at the time of Jurcich's detention. At that time, deliberate indifference claims required proof that the defendant: "(1) subjectively knew the detainee was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins v. Seeman,* 462 F.3d 757, 761 (7th Cir. 2006). If the circumstances suggest the defendant had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant had actual knowledge of the risk. *See Sanville*, 266 F.3d 724, 737 (7th Cir. 2001).

No reasonable jail officer who heard Jurcich explicitly say that he was going to kill himself and walked away without doing anything could be under the misapprehension that doing so was legally appropriate. Similarly, taking the facts in the light most favorable to Plaintiff, none of the jail officers who participated in the alleged excessive force incident, if Jurcich was not resisting, could reasonably have thought it constitutionally appropriate.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 190) is **GRANTED** on Count I of the Third Amended Complaint as to Defendants Frierdich and Sutherlin, and **GRANTED** on Count III with respect to Plaintiff's claims based on Jail booking policies and procedures, the practice of having a jail officer present during mental health screenings, and post-incident investigations. The Motion is **DENIED** in all other respects.

**IT IS SO ORDERED.**

**DATED: January 29, 2019**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**United States District Judge**